IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–CV–01034–EWN–KMT

UNITED STATES OF AMERICA,

      Plaintiff, and

THE STATE OF COLORADO,

      Plaintiff-Intervenor,

ROCKY MOUNTAIN CLEAN AIR
ACTION, and
NATURAL RESOURCES DEFENSE
COUNCIL,

Plaintiff-Intervenors,

v.

KERR-MCGEE CORPORATION,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a case under the Clean Air Act. The United States of America (the "United

States"), on behalf of the Environmental Protection Agency (the "EPA"), and the State of

Colorado ("Colorado") allege that Defendant Kerr-McGee Corporation, as an operator of natural

gas production facilities in Colorado and Utah, violated a variety of federal and state laws and

regulations regarding the emission of hazardous air pollutants. This matter is before the court on

the United States' "Motion to Enter Consent Decree," filed August 28, 2007. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345, 1355, 1367, and 42 U.S.C. § 7413.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.  *The Complaint*

Defendant is a corporation doing business in Utah and Colorado. ' (Compl. ¶ 5 [filed May 17, 2007] [hereinafter "U.S. Compl."].)  Defendant owns and operates three natural gas compressor stations in the Uintah Basin in Utah: (1) the Cottonwood station; (2) the Ouray station; and (3) the Bridge station.  (*Id.* ¶¶ 7–8, 12.)  Defendant owns and operates five additional natural gas compressor stations in the Denver-Julesburg Basin ("D-J Basin") in Colorado: (1) the Hudson station; (2) the Dougan station; (3) the Frederick station; (4) the Fort Lupton station; and (5) the Platteville station.  (*Id.* ¶¶ 7, 13, 19.)

The complaint asserts eleven claims for relief.  (*Id.* ¶¶ 43–119.)  The first seven counts concern Defendant's Utah operations.  (*Id.* ¶¶ 43–94.)  Counts I and II allege that Defendant installed natural gas dehydrators at its Cottonwood and Ouray stations without federally required permits.  (*Id.* ¶¶ 43–52.)  Count III alleges that Defendant violated federal regulations by installing and operating the dehydrator at its Cottonwood station without complying with various preconstruction approval processes, recording and reporting requirements, and antipollution plans and controls.  (*Id.* ¶¶ 53–62.)  Count IV alleges that Defendant installed and operated the dehydrator at its Ouray station without complying with various regulatory planning and reporting requirements.  (*Id.* ¶¶ 63–67.)  Counts V and VI allege that Defendant installed and operated reciprocating internal combustion engines ("RICE units") at its Cottonwood and Ouray stations

without "oxidation catalyst controls," operational plans, or performance testing required by federal regulations. (*Id.* ¶¶ 68–84.) Count VII alleges that Defendant was unable to demonstrate compliance with applicable emission and operation limitations for two RICE units at its Bridge station. (*Id.* ¶¶ 85–92.) Count VII further alleges that Defendant structured its construction activities at the Bridge station to delay triggering the applicability of certain regulations. (*Id.* ¶¶ 93–94.)

The last four counts of the United States' complaint concern Defendant's Colorado operations.[1] (*Id.* ¶¶ 95–119.) Count VIII of the United States' complaint alleges Defendant failed to install oxidation catalysts on the RICE units at its Frederick, Fort Lupton, Hudson, and Dougan stations, in violation of the Colorado Air Quality Control Commission's federally approved Regulation Number 7, Section XVI ("Regulation Number 7"). (*Id.* ¶¶ 95–100; *accord* Colo. Compl. ¶¶ 32–40 [Count I]);[2] *see* 5 Colo. Code Regs. § 1001-9. Counts IX and X allege that Defendant exceeded permit-established emission limits at both its Platteville and Fort Lupton stations. (U.S. Compl. ¶¶ 101–10; *accord* Colo. Compl. ¶¶ 41–63 [Counts II and III].) Finally,

_____

[1]After the United States filed its complaint, Colorado intervened and filed a complaint. (Compl. in Intervention [filed June 1, 2007] [hereinafter "Colo. Compl."].) Colorado's five-count complaint tracks each of the United States' claims concerning Defendant's operations in the D-J Basin. (*Compare id.*, *with* U.S. Compl.)

[2]Rocky Mountain Clean Air Action and the Natural Resources Defense Council (collectively "RMCAA") have proffered a two-count complaint to this court. (Mot. to Intervene and Join Parties, Ex. A [RMCAA Compl.] [filed Aug. 17, 2007] [hereinafter "RMCAA's Br."].) The first count mirrors Count VIII of the United States' complaint, and the second count asserts that the acts alleged in the first also constitute breaches of Defendant's operating permits. (*See id.*, Ex. A ¶¶ 28–37 [RMCAA Compl.].)

Count XI alleges that Defendant owned and operated storage tanks in the D-J Basin that lacked air pollution control equipment and tracking systems required by Regulation Number 7. (U.S. Compl. ¶¶ 111–19; *accord* Colo. Compl. ¶¶ 64–75 [Counts IV and V].) The United States and Colorado (the "Governments") seek civil penalties and an injunction barring further violations. (U.S. Compl. ¶¶ A–C; *accord* Colo. Compl. at 19–20.)

## 2.      *The Consent Decree*

The same day it filed its complaint, the United States lodged a proposed consent decree with this court. (Notice of Lodging of Consent Decree, Ex. 1 [Consent Decree] [filed May 17, 2007] [hereinafter "Consent Decree"].) The decree is an agreement between the United States, Colorado, and Defendant (the "Settling Parties"), which requires Defendant to reduce emissions of air pollutants by: (1) maintaining low-emission natural gas dehydrators at its existing Uinta Basin stations and installing low-emission dehydrators at any new Uinta Basin stations; (2) installing apparatuses to reduce by ninety-five percent or more the emissions of the natural gas storage tanks in the Uinta and D-J Basins; (3) installing oxidation catalysts and additional pollution-reducing technologies on its current RICE units as well as any units it may add in the future; (4) retrofitting certain "high-bleed pneumatic controllers" with "low-bleed" controllers and otherwise repairing or replacing leaking gas tubing and seals at hundreds of locations so as to conserve an estimated 456 million standard cubic feet of natural gas per year; and (5) agreeing to install only "low-bleed" pneumatic controllers at new sites. (*Id.* § IV.)

Additionally, the decree requires Defendant to: (1) fund, install, and operate "ambient air quality and meteorological monitoring station(s)" in the Uinta Basin to gather data necessary for

use in air quality monitoring under federal and state laws and regulations; (2) complete a feasibility study for a system to gather the gas from multiple wells for processing at a central Uinta Basin facility, and implement such a system if it proves feasible; (3) fund and report the results of an independently conducted performance optimization review targeted at improving energy efficiency and gas recovery at specified Uinta and D-J Basin facilities; (4) submit to the Governments a variety of interim and annual reports concerning air pollution efforts and compliance with the consent decree; (5) pay a $200,000 civil penalty; (6) complete two "supplemental environmental projects," one targeted at reducing road dust in the Uinta Basin by devoting $100,000 to improving roads and the other targeted at reducing air pollution in the Denver metropolitan area by providing $150,000 to support a "cash for clunkers" program; and (7) accept liability for stipulated penalties for any future violations of the consent decree. (*Id.* §§ VII–XIII.) The decree also contains a release of the Governments' civil and administrative claims for violations of permit requirements at all compressor stations in the D-J Basin. (*Id.* § XVII.)

### 3. *Comment Period*

On June 1, 2007, in accordance with the CAA, the United States filed notice of the consent decree in the Federal Register, soliciting public comments thereupon. *See* Notice of Lodging of Consent Decree Under the Clean Air Act, 72. Fed. Reg. 30630-02 (June 1, 2007); *see also* 42 U.S.C. § 7413(g); 28 C.F.R. § 50.7. RMCAA submitted the only set of comments. (*See* Mem. in Supp. of Mot. to Enter Consent Decree, Ex. A [RMCAA Comments] [filed Aug. 27, 2007] [hereinafter "Gov'ts' Br."].) The Settling Parties did not modify the decree in response to these comments. (*See id.* at 5.)

### 4.    *Relevant Briefing*

On August 17, 2007, RMCAA filed a motion to intervene, asserting, *inter alia*, that the CAA confers upon it an unconditional right to intervene. (*See* RMCAA's Br.) On September 4, 2007, the Governments responded. (Pls.' Resp. to RMCAA's Mot. to Intervene and Join Parties [filed Sept. 4, 2007].) On September 6, 2007, Defendant responded. (Kerr-McGee Corp.'s Resp. to RMCAA's Mot. to Intervene and Join Parties [filed Sept. 6, 2007].) Both the Governments and Defendant agreed that RMCAA should be allowed to intervene, but only to file a response to the consent decree. (*See* Gov'ts' Resp.; Def.'s Resp.) On September 20, 2007, RMCAA replied, requesting a limited period of time to conduct discovery into the intended scope of the decree's release of D-J Basin construction permit claims and the rationale behind the $200,000 civil penalty assessment. (RMCAA's Reply to Pls.' and Def. Kerr-McGee Corp.'s Resps. to Mot. to Intervene and Join Parties [filed Sept. 20, 2007] [hereinafter "RMCAA's Reply"].)

On September 28, 2007, I held a status conference regarding RMCAA's motion. (*See* Am. Courtroom Mins. [filed Oct. 2, 2007].) I granted RMCAA's motion to intervene in part, requesting additional briefing from the parties concerning the propriety of RMCAA's discovery request. (*Id.*) On October 17, 2007, Defendant and the Governments filed surreplies, both asserting that additional discovery is unnecessary. (Pls.' Surreply to RMCAA's Reply in Supp. of Mot. to Intervene and Join Parties [filed Oct. 17, 2007]; Kerr-McGee Corp.'s Surreply to Intervenor RMCAA's Mot. to Intervene and Join Parties [filed Oct. 17, 2007] [hereinafter "Def.'s Surreply"].) On November 15, 2007, RMCAA filed its "sur-surreply" in support of additional

discovery.  (RMCAA's Sur-Surreply in Supp. of Mot. to Intervene and Join Parties [filed Nov. 15, 2007] [hereinafter "RMCAA's Surreply Resp."].)

On August 27, 2007, the Governments moved for entry of the consent decree, arguing that the decree is fair, reasonable, and consonant with the goals of the CAA.  (Gov'ts' Br.)  On September 4, 2007, Defendant filed a memorandum in support of the consent decree.  (Kerr-McGee Corp.'s Mem. in Supp. of the United States' Mot. to Enter the Consent Decree [filed Sept. 4, 2007] [hereinafter "Def.'s Br."].)  On November 15, 2007, RMCAA responded to the Governments' motion.  (RMCAA's Resp. to Mot. to Enter Consent Decree [filed Nov. 15, 2007] [hereinafter "RMCAA's Resp."].)  On November 21, 2007, the Settling Parties filed a stipulation correcting a typographical error in the consent decree — the failure to capitalize a reference to a defined term in paragraphs 148a and 148b.  (Joint Stip. of Settling Parties to Correct Typo. Errors in the Proposed Consent Decree [filed Nov. 21, 2007].)  On November 30, 2007, Defendant filed a reply in support of the consent decree.  (Reply of Settling Def. Kerr-McGee Corp. in Supp. of Mot. to Enter Consent Decree [filed Nov. 30, 2007] [hereinafter "Def.'s Reply"].)  The same day, the Governments filed their reply.  (Pls.' Reply to RMCAA's Resp. to Mot. to Enter Consent Decree [filed Nov. 30, 2007] [hereinafter "Gov'ts' Reply"].)  This matter is fully briefed.

## ANALYSIS

### 1.      *General Overview: Clean Air Laws*

A primary purpose of the CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its

population." 42 U.S.C. § 7401(b)(1).  To further this purpose, the CAA mandates a broad range of programs for the prevention of air pollution from diverse sources.  *See id.* § 7401(a)(3).  I briefly describe three relevant CAA programs.

### a.  *State Implementation Plans*

Section 109(b) of the CAA requires the EPA to establish national ambient air quality standards ("NAAQS") at levels that will protect the public health and welfare.  *Id.* § 7409(b). Section 110(a) of the CAA requires each state to develop plans that provide for the implementation, maintenance, and enforcement of the NAAQS set by the EPA.  *Id.* § 7410(a). The plans, commonly referred to as State Implementation Plans ("SIPs"), must include "enforceable emission limitations and other control measures, means, or techniques" necessary or appropriate to ensure compliance with the NAAQS.  *See id.* § 7410(a)(2)(A).  Once a SIP is approved by the EPA, its requirements may be enforced by the EPA, the state, and citizens.  69 Fed. Reg. 76617, 76619 (Dec. 22, 2004).

### b.  *The Prevention of Significant Deterioration Permit Program*

The Prevention of Significant Deterioration ("PSD") Program is designed to protect and prevent deterioration of air quality in areas that meet NAAQS.  *See* 42 U.S.C. §§ 7470–7492. The PSD program is a pre-construction permitting program.  *See id.* § 7475.  The EPA has authorized Colorado to issue PSD permits to sources within the state.  51 Fed. Reg. 31125 (Sept. 2, 1986).  PSD requirements apply when the construction of a new major stationary source of air pollutants has the potential to emit a pollutant subject to regulation under the CAA in excess of specified amounts.  *See id.*

### c.      The Title V Operating Permit Program

Title V of the CAA requires sources subject to its requirements to obtain an operating permit. *See* 42 U.S.C. § 7661 *et seq.* The EPA has authorized Colorado to issue operating permits to polluting sources within the state. 65 Fed. Reg. 49919 (Aug. 16, 2000). Operating permits set out in one single permit all of the requirements that apply to the source, including emission limitations and other requirements set forth in PSD construction permits, monitoring, recordkeeping and reporting requirements, and a schedule for compliance designed to address outstanding violations of CAA requirements. *See* 40 C.F.R. §§ 70.3(c)(1), 70.6.

## 2.      Legal Standard: Approval of Consent Decree

A district court has power to enter a consent decree without first determining that a statutory violation has occurred. *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125–26 (D.C. Cir. 1983) (citing *Swift & Co. v. United States*, 276 U.S. 311, 327 [1928]). "While the court may either approve or deny the issuance of a consent decree, generally it is not entitled to change the terms of the agreement stipulated to by the parties. . . . [Instead,] [i]f the court discerns a problem with a stipulated agreement, it should advise the parties of its concern and allow them an opportunity to revise the agreement." *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991) (citations and internal quotation marks omitted). "The relevant standard . . . is not whether the settlement is one which the court itself might have fashioned, or considers as ideal . . . ." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990). Instead, in evaluating a consent decree, it is the district court's duty to "ensure that the agreement is not illegal, a product of collusion, or against the public interest. The court also has the duty to

decide whether the decree is fair, adequate, and reasonable before it is approved." *Colorado*, 937

F.2d at 509 (citations omitted); *accord Cannons Eng'g*, 899 F.2d at 85 ("Reasonableness,

fairness, and fidelity to the statute are . . . the horses which district court judges must ride.").

Fairness has both procedural and substantive components. *Cannons Eng'g*, 899 F.2d at

86. "'To measure procedural fairness, a court should ordinarily look to the negotiation process

and attempt to gauge its candor, openness, and bargaining balance.'" *United States v. Telluride*

*Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (quoting *Cannons Eng'g*, 899 F.2d at 86). "A

consent decree that is substantively fair incorporates 'concepts of corrective justice and

accountability: a party should bear the cost of harm for which it is legally responsible.'" *Id.*

(quoting *Canons Eng'g*, 899 F.2d at 87).

"At least three factors are relevant in discerning whether the decree is reasonable: (1)

whether the decree is technically adequate to accomplish the goal of cleaning the environment, (2)

whether it will sufficiently compensate the public for the costs of remedial measures, and (3)

whether it reflects the relative strength or weakness of the government's case against the

environmental offender." *Id.* (citing *Cannons Eng'g*, 899 F.2d at 89–90). Overlaid on this

evaluation is the most important factor: whether the consent decree is in the public interest and

upholds the objectives of the CAA. *Id.*; *see* 42 U.S.C. § 7401(b)(1).

In conducting this analysis, the court must keep in mind the strong policy favoring the

voluntary settlement of disputes. *United States ex rel. Mich. Dep't of Envtl. Quality v. Wis. Elec.*

*Power Co.*, 522 F. Supp. 2d 1107, 1111–12 (D. Wis. 2007) (citing *Cannons Eng'g*, 899 F.2d at

84; *United States v. Hooker Chem. & Plastics Corp.*, 776 F.2d 410, 411 [2d Cir. 1985]). This

presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the EPA, which enjoys substantial expertise in the environmental field. *Id.* (citing *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 [6th Cir. 1991]; *Hooker*, 776 F.2d at 411); *accord In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992); *NICCW v. AgriProcessors, Inc.*, 469 F. Supp. 2d 666, 672–73 (D. Iowa 2006). Thus, while a district court may not merely rubber-stamp a consent decree, it "must defer heavily to the parties' agreement and the EPA's expertise." *United States v. Charles George Trucking*, 34 F.3d 1081, 1085 (1st Cir. 1994); *see also United States v. State of Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) ("[T]he court's approval is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." [citation and quotation marks omitted]).

3.    *Analysis*

a.    *Overview*

RMCAA agrees that "the decree provides for significant environmental benefits," but asserts that this court "may wish to exercise its discretion" to require the Settling Parties to modify the decree based on two narrow concerns. (*See* RMCAA's Resp. at 2.) RMCAA's chief concern is the decree's release of governmental claims for violations of PSD construction permitting requirements. (*See id.* at 19–33.) Outside of the instant matter, RMCAA is presently challenging the way in which Colorado defines sources of pollution for purposes of triggering PSD permitting requirements. (*See Analysis* § 3c[ii][a], *infra* [discussing the pending permitting challenge in more detail].) RMCAA's involvement in the instant matter appears to be driven

principally by its fear that the decree's PSD release may have an adverse collateral impact on

citizen suits it may pursue against Defendant in the future if it prevails in its pending permitting

challenge.  (*See id.*)  In addition to attacking the PSD release, RMCAA also asserts that the

decree's civil penalty assessment is inadequate to hold Defendant accountable for the harms

caused by its statutory and regulatory noncompliance.  (*See* RMCAA's Resp. at 33–39.)  Below, I

consider RMCAA's objections, as well as the decree's overall fairness, reasonableness, and

fidelity to the CAA.

### b. Threshold Issue: The Scope of the Decree

In *Local No. 93, International Association of Firefighters v. City of Cleveland*, the

Supreme Court ruled that a consent decree must: (1) spring from and serve to resolve a dispute

within the court's subject matter jurisdiction; (2) come within the general scope of the case based

on the pleadings; and (3) further the objectives of the law on which the claim is based.  478 U.S.

501, 525 (1986).  RMCAA asserts that because the complaint does not assert PSD-based claims

against Defendant's D-J Basin compressor stations, the decree fails to satisfy the requirements of

*Firefighters*.  (*See* RMCAA's Resp. at 18–21.)  I disagree.

First, it is beyond doubt that the decree, which seeks to resolve violations of federal and

state clean air laws and regulations, is within this court's subject matter jurisdiction.  *See* 28

U.S.C. §§ 1331, 1345, 1355, 1367; 42 U.S.C. § 7413.  The mere fact that the complaints do not

contain allegations of PSD violations with respect to Defendant's Colorado operations does not

divest this court of such jurisdiction.[3]  *See United States v. Davis*, 261 F.3d 1, 22 (1st Cir. 2001)

(holding that consent decrees may resolve unpleaded claims without running afoul of the Article

III limitation on court jurisdiction to actual cases or controversies).

Second, while RMCAA is correct that the complaints did not allege PSD-based claims

related to the D-J Basin, it is wrong to assert that the decree's release of such claims is beyond the

"general scope" of the emissions issues targeted by the complaints.  The complaints allege that

Defendant operated RICE units at its D-J Basin compressor stations without pollution controls

required under Colorado's federally mandated SIP.  (*See* U.S. Compl. ¶¶ 95–100; Colo. Compl.

¶¶ 32–40.)  The PSD laws and regulations required Defendant to obtain permits prior to

constructing compressor stations with RICE units.  *See* 42 U.S.C. § 7475.  While a PSD-based

claim might cast a wider factual net than a SIP-based claim, both ultimately target the same type

of conduct: the operation of RICE units.  *See Davis*, 261 F.3d at 23 ("[A] settlement that is

greater in scope than the originally pled claims . . . is permissible pursuant to *Firefighters*.");

*Charles George Trucking*, 34 F.3d at 1090 (approving consent decree resolving "potential

claims" that fell within the general scope of the pleadings); *Sierra Club v. Elec. Controls Design*,

909 F.2d 1350, 1355 (9th Cir. 1990) (holding that the district court had the power to enter a

consent decree as long as the decree "further[ed] the broad objectives upon which the complaint

was based").  Thus, I find that the decree's resolution of potential PSD claims is permissible

because it falls within the general scope of the pleadings concerning RICE unit noncompliance.

---

[3]I note that the United States' complaint *did* allege PSD claims with respect to
Defendant's Utah operations.  (U.S. Compl. ¶¶ 43–52.)

Finally, as I explain more thoroughly below, the decree unquestionably furthers the objectives of the CAA by requiring Defendant to comply therewith and by requiring Defendant to develop and implement technologies for the prevention of future air pollution. (*See Analysis* § 3c[ii][b], *infra*); 42 U.S.C. § 7401(b)(1)–(2). Indeed, RMCAA has essentially conceded this, recognizing that "the [d]ecree provides for significant environmental benefits." (RMCAA's Resp. at 2.) Accordingly, I find that the decree comports with *Firefighter*'s requirements.

### c. Fairness

As stated above, fairness has both procedural and substantive components. *Cannons Eng'g*, 899 F.2d at 86. I consider each component in turn.

#### i. Procedural Fairness

With respect to the procedural fairness of the decree, RMCAA argues that its exclusion from the negotiations between the United States, Colorado, and Defendant casts doubt upon the "candor, openness, and bargaining balance" of the settlement negotiations. (RMCAA's Resp. at 26–27.) I disagree.

RMCAA has pointed to no authority suggesting that the Settling Parties did anything improper by failing to invite it to the bargaining table. To the contrary, "[t]here is no requirement that the Government allow third parties to participate in settlement negotiations." *United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1052 (N.D. Ind. 2001); *accord Cannons Eng'g*, 899 F.2d at 93 ("So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses."); *AgriProcessors*, 469 F. Supp. 2d at 674; *United States v.*

*Brook Village Assocs.*, No.Civ.A. 05-195, 2006 WL 3227769, at *5 (D.R.I. Nov. 6, 2006).[4]

Moreover, RMCAA's contention that it was denied a role in the settlement process is undermined

by the fact that, in accordance with the CAA and federal regulations, it was afforded an

opportunity to comment on the proposed settlement. *See* 42 U.S.C. § 7413(g); 28 C.F.R. § 50.7.

RMCAA embraced that opportunity. (*See* Gov'ts' Br., Ex. 1 [RMCAA Comments].) "The fact

that the [Governments] did not ultimately adopt [RMCAA's] adverse comments, does not mean

that [RMCAA] was denied a chance to participate in the process of finalizing the proposed

consent decrees." *Brook Village Assocs.*, 2006 WL 3227769, at *5.

      More broadly, I find that the decree is the fruit of "good faith, arms-length negotiations."

*See Oregon*, 913 F.2d at 580. The decree is the product of extensive, vigorous, year-long, three-

way negotiations between the United States, Colorado, and Defendant. (Gov'ts' Br. at 11, 29.)

Indeed, RMCAA does not dispute that the EPA *and* the Colorado Department of Public Health

and Environment, both of which are committed to the protection of the public interest, devoted

their extensive expertise and judgment to reaching the accord. *See Cannons Eng'g*, 899 F.2d at

84 (noting that a reviewing court should be particularly deferential where "a government actor

committed to the protection of the public interest has pulled the laboring oar in constructing the

proposed settlement"); *see also Sam Fox Pub. Co. v. United States*, 366 U.S. 683, 689 (1961)

("[S]ound policy would strongly lead us to decline . . . to assess the wisdom of the Government's

---

      [4]RMCAA argues that this line of cases is distinguishable because, unlike the parties involved therein, it is presently involved in a permitting challenge that *may* be impacted by the consent decree's PSD release. (RMCAA's Resp. at 27–28.) I am not convinced.

judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim

of bad faith or malfeasance on the part of the Government in so acting.").  Additionally, as just

discussed, the Governments complied with the statutory notice requirement, and have considered

RMCAA's objections to the decree.  (*See* Gov'ts' Br. at 32–48, Ex. 1 [RMCAA Comments].)

Based on all of the foregoing, I am satisfied that the decree is the result of a good faith

governmental endeavor.

### ii.        *Substantive Fairness*

With respect to substantive fairness, RMCAA questions both the decree's release of PSD

claims and its civil penalty assessment.  (RMCAA's Resp. at 18–39.)  I engage each aspect of the

decree in turn.  In the process of this analysis, I find that the decree as a whole comports with

notions of substantive fairness.

### (a)        *PSD Brouhaha*

Outside of the instant matter, RMCAA is in the midst of challenging Colorado's decision

to grant a PSD operating permit for Defendant's Frederick, Colorado, compressor station.  (*Id.* at

11.)  In that pending permitting challenge, RMCAA asserts that Colorado erred by failing to

define the Frederick compressor station to include not only the station itself, but also "related

equipment located at wellheads and other locations and are interrelated to the emissions units at

the Frederick compressor station."  (*See id.* at 11, 22–23.)  In the instant matter, RMCAA faults

the consent decree for failing "to specify which emissions units are covered by [the decree's] PSD

release."  (*Id.* at 26.)  RMCAA appears to believe that if the decree's release could be said to

apply not only to the Frederick compressor station itself but also to contiguous, interrelated

"equipment located at wellheads and other locations," then, if RMCAA prevails in its pending

permitting challenge, it would be foreclosed from instigating a citizen suit against Defendant for

permit violations. (*See id* at 22–26.) Such a result, argues RMCAA, would be "substantively

unfair."[5] (*Id.* at 26.)

      The Settling Parties emphatically dispute that the PSD release is ambiguous, asserting that

it plainly does not concern equipment at wellheads and other locations near Defendant's

compressor stations. (*See* Gov'ts' Br. at 38–41; Gov'ts' Reply at 4–6; Def.'s Reply at 7–11.)

Indeed, the Settling Parties go so far as to *admit* that the decree's PSD release "clearly *does not*

*release [Defendant]* from any potential liability based on the theory that [RMCAA] advocate[s]."

(Resp. by the United States and the State of Colo. to the Notice Filed by RMCAA at 2–3 [filed

Feb. 14, 2008] [emphasis added]; *accord* Gov'ts' Reply at 4–6; Def.'s Reply at 10–11; Def.'s

Surreply at 5–6.) I agree with the Settling Parties.

      The consent decree releases PSD claims relating to "any increase in emissions resulting

from the construction by [Defendant] of the Dougan and Frederick [compressor stations]," as

well as PSD "claims that relate to any allegations of engine modifications to RICE [units] located

at D-J Basin Facilities." (Consent Decree § XVII ¶ 148a, c.) In the release, "D-J Basin Facilities"

is a defined term. (*Id.* § III ¶ 5d.) The term is expressly defined to *exclude* all "wellhead

---

[5]I have grave concerns about the overall propriety of RMCAA's challenge. First, it is focused on speculative concerns. Second, given that CAA citizen suits appear to be aimed not at enforcing individual rights, but rather at enforcing federal laws existing for the general good, I am not persuaded that the Governments would not be well within their rights, as the entities entrusted with protecting the public good, to release RMCAA's potential claims. Nevertheless, because the Settling Parties resolve the PSD issue on more parochial grounds, I opt to follow suit.

facilities" throughout the D-J Basin. (*Id.*) Thus, RMCAA's assertion that the decree does "not clearly indicat[e] whether wellhead facilities are included in the PSD release[]" is patently wrong. (*See* RMCAA's Resp. at 24.)

"D-J Basin Facilities" is further defined to *include* eight specific "[c]ompressor [s]tations," and *nothing more*. (Consent Decree § III ¶ 5d, App. A [D-J Basin Facilities].) Each of those eight specified stations is identified by its precise address. (*Id.*, App. A [D-J Basin Facilities].) Indeed, nothing in the decree begins to suggest that it concerns anything *but* the specifically demarcated compressor stations.[6] (*See id.*)

Thus, the decree is not ambiguous with regard to whether it applies to "related equipment located at wellheads and other locations." Even if it were, such ambiguity would be of little practical import because all parties to the consent decree have agreed, in writing, that the decree was not intended to foreclose the theory of RMCAA's pending challenge. Thus, the Settling Parties have given RMCAA the strongest imaginable sort of parole evidence: their unequivocal admissions that the PSD release does not bar RMCAA's potential claims. Based on all of the foregoing, I reject RMCAA's argument that the PSD release in the decree is substantively unfair.

### *(b)* *Civil Penalty*

---

[6]The disconnect between RMCAA's argument here and its argument in its pending challenge to the Frederick compressor station permit is startling. Both the decree and the Frederick station operating permit identify the Frederick compressor station in the same manner. (*Compare* Consent Decree, App. A [D-J Basin Facilities], *with* RMCAA's Br., Ex. B at 3 [Frederick Station Permit, No. 95OPWE035].) As noted above, RMCAA bases its pending challenge of the Frederick permit on the ground that said permit incorrectly includes *only* the Frederick compressor station and *not* contiguous equipment at "wellheads and other locations." (RMCAA's Resp. at 11 [citing Frederick Station Permit, No. 95OPWE035].)

RMCAA additionally asserts that the consent decree should be amended because its $200,000 civil penalty assessment is too low. (RMCAA's Resp. at 33–39.) RMCAA essentially takes a "divide and conquer" approach to the penalty assessment, critiquing it in isolation from the other aspects of the decree. (*See id.*) Indeed, RMCAA curiously suggests that the fact that the decree achieves environmental benefits in *excess* of those required by the relevant laws and regulations is irrelevant to any evaluation of the civil penalty assessment. (*See id.* at 37 ["While such efforts (to secure benefits not required by law) are commendable, they do not excuse a failure to recover economic benefit(s derived from past CAA violations)."].) I disagree.

RMCAA's cramped analysis is unsound. The concepts of "corrective justice and accountability" need not be as narrow and retrograde as RMCAA's position suggests. RMCAA does not dispute that the comprehensive agreement reached by the Settling Parties requires much more than mere compliance with clean air laws and regulations. (*See* Gov'ts' Br. at 31–32; Def.'s Br. at 12–13; *see also* RMCAA's Resp. at 2.) After a careful review of the consent decree, I am satisfied that its relatively modest civil penalty assessment is counterbalanced by its injunctive provisions. *See Agriprocessors*, 469 F. Supp. 2d at 675–76 (considering consent decree's injunctive aspects in evaluating a challenge to its civil penalty's substantive fairness). Not only does the decree require Defendant to correct the violations identified in the complaints by implementing legally mandated operational measures and pollution control technologies, (*see* Consent Decree § IV ¶¶ 6–57), it goes much further, requiring Defendant to take additional measures beyond those mandated by clean air laws and regulations. For example, Defendant agrees to: (1) replace numerous "high-bleed" pneumatic controllers with controllers that

-19-

significantly reduce or eliminate polluting emissions, (*id.* § IV ¶¶ 58–65);[7] (2) implement sulfur removal technologies in the Uinta Basin, (*id.* § IV ¶¶ 66–68); (3) purchase, install, and operate ambient air quality and meteorological monitoring stations near the Uinta Basin, (*id.* § VII ¶¶ 80–82); (3) complete a feasibility study of a system for gathering gas from multiple wells at a central processing facility, and implement the system if it proves feasible, (*id.* § VIII ¶¶ 83–90); (4) pay for and report the results of an independently conducted performance optimization review targeted at improving energy efficiency and product recovery, (*id.* § IX ¶¶ 91–95); and (5) complete two "supplemental environmental projects," at a cost of $250,000, targeted at reducing air pollution in Utah and Colorado, (*id.* § XI ¶¶ 100–02).

Perhaps the civil penalty *alone* fails to make Defendant pay "the cost of the harm for which it is legally responsible." *See Telluride Co.*, 849 F. Supp at 1402. However, those aspects of the decree that reach outside of the applicable statutory and regulatory framework serve to bring it into alignment with notions of substantive fairness because they require Defendant to engage pollution-related problems it previously ignored. Moreover, those same aspects of the decree also comport with the goals of the CAA itself. *See* 42 U.S.C. § 7401(b)(1) (stating that the CAA's goals include "protect[ing] and enhanc[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population"). Based on the foregoing, I am satisfied that the decree, when taken as a whole, requires Defendant

---

[7]RMCAA disputes the Governments' assertion that Defendant is under "no regulatory obligation" to install these controllers. (*See* RMCAA's Resp. at 38.) Even if RMCAA is correct, it has no impact on my conclusions.

to bear the costs of its past harms — by paying a civil penalty *and* by undertaking pollution reducing projects above and beyond those it would be required to undertake under the CAA alone.[8]  *See generally Oregon*, 913 F.2d at 581 (noting judicial approval of a consent decree "is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice" ).

RMCAA makes a number of unavailing arguments counseling against this conclusion, only three of which merit even the most fleeting consideration.  First, RMCAA points out that certain technological advances required under the consent decree will ultimately benefit Defendant. (RMCAA's Resp. at 37.)  This casts no doubt on the fairness of the decree; two rights do not make a wrong, and the fact that Defendant might eventually profit from its investments in efficiency does not negate the fact that the nation's air quality will also benefit thereby.

Second, RMCAA complains that the civil penalty is not larger given the fact that Defendant submitted a "misleading" request for an exemption for its D-J Basin RICE units to a Colorado regulatory agency in 2005.[9]  (*Id.* at 35 & n.14.)  Even assuming that the calculation was intentionally misleading, I find that this would be a woefully insufficient basis upon which this

_____

[8]No doubt, the civil penalty could have been greater, but even if the decree did not include the additional pollution-related projects, it still might stand.  *See, e.g.*, *United States v. Chevron U.S.A. Inc.*, 380 F. Supp. 2d 1104, 1120 (D. Cal. 2005) (approving consent decree imposing eight million dollars in penalties and supplemental environmental projects notwithstanding *amici*'s estimates of two billion dollars in potential penalty liability).

[9]Specifically, RMCAA asserts that Defendant submitted a cost assessment of oxygen catalyst implementation which was inflated by a calculation that failed to account for emissions reductions over a sufficiently lengthy time period.  (*See* Gov'ts' Br., Ex. A at 13 [RMCAA Comments].)  The Colorado agency was not mislead by this calculation and, indeed, specifically rejected it.  (*See id.*)

court might direct the parties to revise the decree. *See Cannons Eng'g*, 899 F.2d at 85–86 (noting that a district court should take a "broad view of proposed settlements," leaving "relatively petty inequities to the discourse between the parties").

Finally, RMCAA suggests that I should evaluate the civil penalty as if the consent decree were a judgment on the merits of the Governments' complaints. (*See* RMCAA Resp. at 33–35.) "A consent decree is not reviewed as a judgment on the merits." *United States v. Metro. St. Louis Sewer Dist.*, 952 F.2d 1040, 1044 (8th Cir. 1992). "'Naturally, the agreement reached [in a consent decree] normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.'" *Colorado*, 937 F.2d at 508 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 87 [1981]). To review the decree with the focus RMCAA endorses would be to jettison the deference to which a good faith, arms-length compromise such as this is entitled.

Generally, "consent decrees are built on compromise and compromise in turn is a product of judgment." *United States v. Comunidades Unidas Contra La Contaminación*, 204 F.3d 275, 282 (1st Cir. 2000). Here, the Governments have offered a variety of convincing bases for the civil penalty amount — *e.g.*, that the decree: (1) declines substantial monetary punishment in favor of Defendant's willing undertaking of technological research and other progressive measures; (2) accounts for Defendant's potential legal defenses to this claim; (3) considers the extensive avoided costs of litigation; and (4) accounts for the fact that Defendant reported many of the violations at issue in the complaint. (*See* Gov'ts' Br. at 11–13, 22–24, 47–48.) RMCAA

has failed to convince me that these justifications are the product of anything other than the reasoned judgment of seasoned experts. The civil penalty will stand.

### d.        *Reasonableness and Fidelity to the CAA*

Taking a broader view of the decree, I am satisfied that it is reasonable. The decree is technically adequate, compensates the public for the alleged violations, and reflects the relative strengths and weaknesses of the Governments' claims. *See Telluride Co.*, 849 F. Supp. at 1403. The decree contains specific relief, such as the installation of advanced pollution controls, which fully corrects the deficiencies alleged in the governmental complaints. (*See* Gov'ts' Br. at 15–18 [discussing Consent Decree § IV].) And I agree with the Governments that the decree will likely lead to legal and regulatory compliance in far less time than if the Settling Parties had litigated the matter. (*See id.* at 31.) Moreover, as discussed above, the decree compensates the public for past harms by requiring Defendant to undertake substantial air quality-related measures in excess of those which this court could have imposed through an injunction enforcing the relevant laws and regulations. (*See Analysis* § 3c[ii][b], *supra*.) Finally, I am satisfied that in negotiating the decree, the Governments have considered the relative merits of their claims and Defendant's defenses, while also considering the costs and risks associated with litigating a case such as this. (*See* Gov'ts' Br. at 11–13, 22–24, 29.)

Lastly, I find that the decree is consistent with the chief purposes of the CAA, which are to protect and enhance the nation's air quality and to accelerate research and development to prevent and control air pollution. *See* 42 U.S.C. § 7401(b)(1)–(2). The decree will reduce by ninety-five percent or more the emissions of Defendant's natural gas storage tanks in the Uinta

and D-J Basins and will conserve an estimated 456 million standard cubic feet of natural gas per year. (*See* Consent Decree § IV.) Moreover, as discussed at length above, the decree's broad injunctive measures will immediately mitigate pollution and will foster the development of new pollution-reducing technologies into the future. (*See Analysis* § 3c[ii][b], *supra*; Gov'ts' Br. at 48.) Thus, I am satisfied that the decree is in harmony with the goals of the CAA and the interest of the public in the clean and efficient extraction of natural gas resources.

### e. Requested Discovery

Retreading familiar ground, RMCAA also requests discovery to unearth the "intent" of the Settling Parties with regard the amount of the civil penalty and the impact of the PSD release on RMCAA's permitting challenge. (*See* RMCAA's Reply; RMCAA's Surreply Resp.) This is not one of those "rare instances" where the court need decline entry of a consent decree due to inadequate information. *See Agriprocessors*, 469 F. Supp. 2d at 675 (citing *United States v. Wal-Mart Stores, Inc.*, No. Civ.A.04-301-GMS, 2004 WL 2370700, at *1–2 [D. Del. Oct. 14, 2004] [reserving ruling on motion to enter consent decree until the parties provided the court with more information because the government had proffered "barely more than one page" explaining the decree]). Moreover, RMCAA's request for discovery into the Settling Parties' "intent" is most unlike the substantive discovery requested and granted in the order upon which RMCAA premises its argument. (*See* RMCAA's Reply at 4–5 [citing *United States v. Wis. Elec. Power Co.*, No. 03-C-0371, at 3 (E.D. Wis. Sept. 28, 2004) (granting stay so intervenors could conduct discovery "necessary to assess the United States' *claims in support of the decree*" [emphasis added])]). The record before me was more than sufficient to support my determination that the

decree is fair, reasonable, and consonant with the purposes of the CAA. Consequently, I deny RMCAA's request for discovery.

**4.     Conclusion**

Based on the foregoing it is therefore ORDERED that:

1.      The GOVERNMENTS' motion (#23) to enter the consent decree is GRANTED. The consent decree (#2), as amended by the Joint Stipulation of Settling Parties (#51), is hereby entered. The Settling Parties may, if they wish, submit for consideration a single decree in which the typographical errors in the joint stipulation have been corrected.

2.      RMCAA's motion (#16) is GRANTED in part and DENIED in part. As noted in this court's minutes (#43), the motion is granted with respect to RMCAA's request to intervene. The motion is denied with respect to RMCAA's request for discovery (*see* #50).

3.      The clerk shall close this case.

Dated this 26th day of March, 2008

BY THE COURT:

s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge